UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re:<br><br>RICHARD J. SILVA,<br>Debtor. | Chapter 7<br>Case No. 18-13128 |
| PETER B. TROWT and BEVERLY STORAGE WAREHOUSE & TRAILER LEASING, INC.,<br>Plaintiffs,<br><br>vs.<br><br>RICHARD J. SILVA,<br>Defendant. | Adv. Proceeding No. 18-01168 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This action arises from a pair of judgments entered in a Massachusetts state court action (the "State Court Action")[1] against the debtor in the underlying Chapter 7 bankruptcy and defendant in the instant adversarial proceeding, Richard J. Silva ("Silva"), and in favor of the plaintiffs, Peter B. Trowt ("Mr. Trowt") and Beverly Storage Warehouse & Trailer Leasing, Inc. ("BSWTL")(collectively the "Plaintiffs").

On August 16, 2018, Silva filed a voluntary petition seeking relief under Chapter 7 of the Bankruptcy Code, commencing the above-captioned Chapter 7 case. Pursuant to the judgments

[1] See Trowt v. Silva, Essex County Superior Court Department, Civil Action No. 2011-01279.

in the State Court Action, Trowt is listed in Silva's Chapter 7 Schedule E/F as a judgment creditor. Similarly, BSWTL is also listed in Silva's Chapter 7 Schedule E/F as a judgment creditor.

As set forth in the Proof of Claim filed by Trowt on November 6, 2018, the judgment on Trowt's claim is $710,601.65 (the "Trowt Judgment"), including interest at the statutory rate of 12% through August 16, 2018. Similarly, as set forth in the Proof of Claim filed by BSWTL on November 6, 2018, the judgment on BSWTL's claim is $493,385.42 (the "BSWTL Derivative Judgment"), including interest at the statutory rate of 12% through August 16, 2018. (the Trowt Judgment and BSWTL Derivative Judgment will be collectively referred to as the "Trowt and BSWTL Judgments").

The Plaintiffs filed the Complaint to Determine Dischargeability of Debts (the "Complaint") in the instant adversarial proceeding on November 8, 2018, alleging nondischargeability of the Trowt Judgment pursuant to 11 U.S.C. § 523(a)(2)(A) (Count I) and 11 U.S.C. § 523(a)(4) (Count IV), and nondischargeability of the BSWTL Derivative Judgment pursuant to those same provisions, Counts II and III, respectively. The Plaintiffs now move this honorable Court for Summary Judgment in their favor on all counts of the Complaint. For the reasons set forth herein, the Plaintiffs respectfully request that their Motion for Summary Judgment be **ALLOWED**.

## I. FACTUAL BACKGROUND[2]

### *A. Beverly Storage Warehouse and Trailer Leasing, Inc.: Roles and Management*

[2] The facts are largely taken from the "Findings of Fact, Rulings of Law, and Order for Judgment" in the State Court Action, a true and accurate copy of which is attached hereto as **Exhibit A**.

In 1993, Trowt and Silva formed a partnership when each purchased a fifty percent interest in BSWTL.[3] (Ex. A at p. 4). BSWTL was later incorporated in 1997, and Trowt and Silva each became a fifty percent shareholder. (Id. at p. 5). The agreement between Trowt and Silva with respect to BSWTL was that all profits and losses would be split on a fifty-fifty basis. (Id.).

Beginning in 1993 and at all relevant times thereafter, Silva was responsible for all financial aspects BSWTL, including, accounts receivable, accounts payable, and vendor payments, as well as other office administration tasks. (Id.). Silva was the only person at BSWTL with access to company passwords, bank accounts, credit cards, and payroll services. (Id.). Silva was the only person who dealt with BSWTL's accountant and was responsible for all of the company's accounting functions. (Id.). Trowt was responsible for generating business for BSWTL. (Id.).

*B. Silva Unilaterally Increases his Salary and Decreases Trowt's*

Beginning in mid to late 2000, Trowt's BSWTL salary was lowered and profits were being split at a sixty-five to thirty-five percent ratio in Silva's favor. (Id. at p. 6). Silva made this change without Trowt's knowledge or consent. (Id.). From 2006 until November of 2011, Silva received a higher salary than Trowt, the ratio during that time being seventy-five to twenty-five percent in Silva's favor. (Id.). Trowt, obviously, never agreed to this salary adjustment and did not discover the seventy-five twenty-five percent split until the latter part of 2010. (Id.).

When Trowt discovered the salary discrepancy he instructed Silva to equalize their salaries, pursuant to their agreement, but Silva refused. (Id.). Moreover, Silva, who had sole

[3]BSWTL is a small closely held corporation providing storage space to its customers in rental storage rooms at its warehouse located at 145 R Hale St., Beverly, Massachusetts, which is owned by the 145 Rear Hale Street Trust, of which Trowt and Silva each own 50% of the beneficial interest, and in storage trailers located in Manchester-by-the-Sea, Massachusetts.

control of BSWTL's payroll, instructed Craig & Withers, BSWTL's accountant, to ignore Trowt's demands for equal pay. (Id.). When Trowt contacted Craig & Withers, he was informed that per Silva's instructions, they could not make any adjustments to his salary. (Id.). Trowt and Silva's salaries were not equalized until November 2011, when Trowt obtained a preliminary injunction, in connection with the State Court Action, ordering Silva to make their salaries equal. (Id.).

From 2006 to November 2011, Silva received $359,575.00 in salary from BSWTL while Trowt received only $141,250.00 in salary from BSWTL. (Id.). Thus, from 2006 to November 2011, when Trowt and Silva agreed to split profits on a fifty-fifty basis, when salaries were the only from of profit distribution BSWTL made, and when Silva was solely responsible for the company's payroll, Silva paid himself $218,325.00 more than he paid Trowt. (Id. at p. 7).

*C. Silva Embezzles Revenue from BSWTL*

In addition to paying himself a higher salary, Silva siphoned revenue and cash from BSWTL. (Id.). Between 2006 and 2011, according to business records, BSWTL's revenue remained relatively flat, averaging approximately $200,000.00 per year. (Id.). Later, in late 2012, when Trowt took over the accounts revivable, including the responsibility for depositing all customer payments into BSWTL's bank account, BSWTL's revenue spiked. (Id.). In fact, annualizing the total deposits through August 2013, showed a nineteen percent increase in revenue for 2013. (Id.).

During the spike in revenue, BSWTL made no operational changes other than the fact that Trowt began handling BSWTL's deposits. (Id.). Being conservative, estimating Silva was skimming only ten percent from BSWTL's revenues, there would have been an additional $140,815.20 in deposits for the period between January 2006 and December 2011. (Id.).

Silva also, without any authority, used funds from BSWTL to put a deposit on land he wished to purchase in Rowley, Massachusetts. (Id.). Silva's testimony in the State Court Action on the issue was contradictory and not credible. (Id.). First, Silva testified that there was only one piece of land that he wanted to purchase and that the only $5,000.00 check was shredded by the seller's real estate agent. (Id.). Then, he testified that the $5,000.00 deposit check was returned. (Id.). When Trowt's counsel showed Silva yet another $5,000.00 check, written off of BSWTL's account, Silva admitted that he had placed a second $5,000.00 deposit on a second piece of land, which he forfeited. (Id. at p. 8).

Silva also collected cash from BSWTL's customers to bring with him on vacation. (Id.). At trial in the State Court Action, Silva's ex-wife, Mary Rees, testified that, prior to scheduled vacation trips, which occurred at least four times per year, Silva would hoard cash (at least $500.00) from BSWTL's deposits for his personal use. (Id.).

*D. Silva Misappropriates BSWTL Assets for Personal Use*

Between 2006 and 2011, Silva opened at least five credit cards in BSWTL's name. Silva opened all of these credit accounts without informing Trowt of their existence. (Id.). Silva used Beverly Storage's credit cards for numerous personal purchases including: dating websites, i.e., match.com and singlesnet.com. restaurants, motorcycles stores, Stop & Shop, numerous gas purchases, massage parlors, shoe polish, noise canceling headphones, numerous telephones, and other various purchases unrelated to the warehouse and storage business. (Id.).

Silva made personal use of every credit account he opened in Beverly Storage's name. (Id.). When questioned about these allegations at trial in the State Court Action, Silva had no credible explanation for the various personal charges; he could not recall what was purchased or,

for example, credibly explain why BSWTL's various credit accounts listed charges for restaurants, massage parlors, grocery stores, etc. (Id.).[4]

Silva used at least $104,355.00 worth of BSWTL's money for his own personal use. (Id.). These personal charges were split into four categories of misappropriation: (1) personal expenses, such as dating websites and department stores; (2) automotive expenses, such as gas purchases and automotive repairs; (3) unrelated office supply purchases; and (4) normal but excessive expenses. (Id. at 8-9). At trial in the State Court Action, Trowt's expert testified that, in reaching this total, she used conservative estimates and that, if she were able to obtain more credit card records the amount and number of Silva's personal charges would be even greater. (Id. at 9). The Court in the State Court Action explicitly credited this testimony. (Id.).

Trowt never agreed that Silva could use BSWTL's credit accounts for his own personal expenses or for expenses related to Silva's other business ventures. (Id.). Upon the initiation of the State Court Action and cancellation of all of BSWTL's credit accounts, all inappropriate and excessive charges stopped. (Id.).

## II. RULINGS OF LAW IN THE STATE COURT ACTION

### *A. Trowt and BSWTL's Claims for Breach of Fiduciary Duty*

With respect to Trowt's claim for breach of fiduciary duty against Silva (Count II), the Court in the State Court Action made the following findings:

> Through the evidence presented at trial, Trowt proved, by a preponderance of the evidence, that Silva breached the fiduciary duty he owed to him. In particular, Trowt proved the following relevant facts: that, as of 1997, when [BSWTL] was incorporated, he and Silva agreed to split profits on a fifty-fifty basis; that the only way [BSWTL] distributed profits was through the payment of salaries; that Silva was solely responsible for the distribution of profits; and that Silva unilaterally

[4] At trial in the State Court Action, Silva's ex-wife, Rees, testified that, during her marriage to Silva, he would regularly (at least monthly) use BSWTL's credit cards at restaurants when paying for dinner and state words to the effect that "this one is on the warehouse." (Id.).

> decreased his (Trowt's) share of the profits by decreasing his (Trowt's) salary, and increasing his own salary. **In paying himself a higher salary, i.e., splitting profits at a seventy-five to twenty-five percent ration in his favor, Silva clearly acted out of "avarice" and "self-interest" in derogation of the fiduciary duty he owed to Trowt. Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty).**
>
> ***
>
> Thus, on Claim II (breach of fiduciary duty), judgment shall enter in favor of Trowt in the amount of $109,162.50.

Id. at p. 13 (emphasis added).

Similarly, with respect to BSWTL's derivative claim for breach of fiduciary duty against Silva (Count 1), the Court in the State Court Action made the following findings:

> In addition, Trowt proved, by a preponderance of the evidence, that Silva breached the fiduciary duty he owed to [BSWTL]. In fact, the evidence presented reveals two different, but related, bases for this claim. First, the evidence at trial demonstrated that, between 2006 and 2011, while he was solely responsible for all financial matters related to [BSWTL's] operations, including payroll and accounts receivable, Silva siphoned revenues and skimmed profits from the business. Second, the evidence at trial demonstrated that, between this same time frame, Silva opened numerous credit accounts in [BSWTL's] name, which he used for his own personal use. For example, the evidence showed Silva used [BSWTL's] accounts to pay for dating websites, department store charges, grocery store charges, personal gas purchases, automotive repairs, and office supplies used in connection with [Silva's other business venture], his personal travel business. **In engaging in this wrongdoing, Silva acted out of "avarice" and "self-interest," contrary to the fiduciary duty he owed [BSWTL]. Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty), as derivative of [BSWTL].**
>
> ***
>
> Thus, on Claim I (breach of fiduciary duty) judgment shall enter in favor of Trowt, derivative of Beverly Storage, in the amount of $245,170.20.

Id. at p. 13-14 (emphasis added).

*B. Trowt's Claim for Breach of Contract and BSWTL's Claim for Conversion*

With respect to Trowt's claim for breach of contract (Count III) and BSWTL's claim for Conversion (Count IV), the Court in the State Court Action made the following findings:

> Trowt's claim for breach of contract (Count III) and his derivative claim for conversion (Count IV) . . . are subsumed into the above analysis. These claims assert the same theories of liability and request, essentially, the same relief. For this reason, the court need not analyze them in detail. Nevertheless, the court notes the following: With respect to the breach of contract claims, judgment shall enter in favor of Trowt. The evidence presented at trial demonstrated the following relevant facts: that Trowt and Silva had an agreement to split profits on a fifty-fifty basis; that Trowt and Silva had an agreement whereby Silva agreed to be responsible for the business's financial and administrative matters while Trowt served as the primary customer contract [sic]; that Silva breached this agreement by paying himself a larger salary and misappropriating funds belonging to [BSWTL]; and that Trowt and [BSWTL] were damaged as a result of Silva's conduct. **Similarly, as to the conversion claim, judgment shall enter in favor of Trowt, as the evidence presented at trial demonstrated that Silva misappropriated money rightfully belonging to Trowt and [BSWTL].**

Id. at p. 16 (emphasis added).

As is clear from the Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action, Silva's conduct resulted in liability on all four claims asserted against him by Trowt and BSWTL: breach of fiduciary duty with respect to BSWTL (Count I), breach of fiduciary duty with respect to Trowt (Count II), breach of contract with respect to Trowt (Count III), and conversion with respect to BSWTL (Count IV).

Silva's liability on the claims asserted against him resulted in the Trowt Judgment and the BSWTL Derivative Judgment entering against Silva. Silva now seeks to have the Trowt Judgment and BSWTL Derivative Judgment discharged as part of his Chapter 7 Bankruptcy filing.

Because Silva's conduct and the resulting judgments constitute a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" and / or a debt "for

money . . . obtained by – false pretenses, a false representation, or actual fraud", they are nondischargeable pursuant to 11 U.S.C. 523(a)(4) and 11 U.S.C. 523(a)(2)(A), respectively. Consequently, the Plaintiffs' Motion for Summary Judgment should be **ALLOWED** on all of their claims of nondischargeability in the instant adversarial proceeding.

## III. ARGUMENT

*A. Standard of Review*

The standard of review on a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 is a familiar one:

> Summary Judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor.

Carlson v. Univ. of New England, 899 F.3d 36, 43 (1st Cir. 2018)(internal citations and quotations omitted). Moreover, in addition to the Plaintiffs being entitled to judgment as a matter of law pursuant to Fed. R. Civ. P. 56, the doctrines of collateral estoppel and res judicata render the Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action preclusive on the issues and claims presented in the Plaintiffs' Complaint.

The doctrine of collateral estoppel gives the Trowt and BSWTL Judgments in the State Court action preclusive effect on the issues and claims of here. See Silva v. Commonwealth of Massachusetts Land Court, 351 Fed. App'x. 450, 457-458 (1st Cir. 2009)("Under the full faith and credit statute, 28 U.S.C. § 1738, a judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered.")(quotations omitted). "[C]ollateral estoppel principles apply in bankruptcy cases to determine the nondischargeability of a debt." M-R Sullivan Mfg. Co. v. Sullivan (In re Sullivan), 217 B.R. 670, 674 (1998)(citing Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991)).

"[T]he collateral estoppel law of the state in which a judgment is rendered applies in determining the dischargeability of a debt." Id. (citations omitted).

As the Court in Silva stated with respect to application of collateral estoppel under Massachusetts law:

> [T]he Supreme Judicial Court recently stated that issue preclusion applies when (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication. Additionally, [4] the issue decided in the prior adjudication must have been essential to the earlier judgment. Massachusetts courts also require that appellate review must have been available in the earlier case before issue preclusion will arise.

Silva, 352 Fed. App'x at 458-459 (citations omitted).

Here, in the State Court Action, there was: (1) a final judgment on the merits of the Plaintiffs' claims for Breach of Contract, Conversion, and Breach of Fiduciary Duty against Silva; (2) Silva was a party in the State Court Action; (3) the issue of Silva's misappropriation of Trowt and BSWTL funds entrusted to him as an officer of BSWTL through his own self-dealing, among all of Silva's other established bad conduct, as fully presented herein and in the Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action, are identical to the issues and claims advanced by the Plaintiffs for the purposes of dischargeability under Sections 523(a)(4) and 523(a)(2)(A), and those issues were essential to the judgments in the State Court Action (4), and; finally, (5) appellate review of the Trowt and BSWTL Judgments was available to Silva.[5]

Similarly, the doctrine of res judicata "requires the presence of three elements: (1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of

---

[5] Silva readily admits in his Answer to the Complaint that the doctrine of collateral estoppel applies to the Trowt and BSWTL Judgments entered in the State Court Action. See Answer at ¶¶ 10-52, 66, 70.

action, and (3) prior final judgment on the merits." Id. at 458. Here, as laid out above and as further detailed below, the State Court Action had the same parties as the instant action, there was a final judgment on the merits in the State Court Action, and the issue of Silva's conduct and the findings of the Court in the State Court Action with respect to that conduct warrant a finding that Silva's liability for the claims in the State Court Action render him liable for the claims brought in the instant action for the purposes dischargeability under sections 523(a)(4) and 523(a)(2)(A).

Thus, the doctrines of res judicata and collateral estoppel dictate a finding that the Trowt and BSWTL Judgments are nondischargeable pursuant to 11 U.S.C. § 523(a)(4). However, even if this Court was not inclined to apply the doctrines of collateral estoppel and res judicata, the Plaintiffs are still entitled to judgment as a matter of law on their Motion for Summary Judmgment.

*B. The Plaintiffs are Entitled to Judgment as a Matter of Law on Counts III and IV of the Complaint as Silva's Conduct Constituted Embezzlement and/or Defalcation While Acting in a Fiduciary Capacity.*

Section 523(a)(4) of the Bankruptcy Code prohibits an individual debtor from discharging any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . ." 11 U.S.C. § 523(a)(4).

Here, based on the findings in the State Court Action and the applicable authority, the Plaintiffs are entitled to judgment as a matter of law on Counts III and IV of the Complaint as Silva's conduct and the resulting harm to the Plaintiffs constituted embezzlement and/or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

i. Embezzlement

Of all the reasons for nondischargeability, Silva's misappropriation of monies rightly belonging to Trowt and BSWTL -- which resulted in the Trowt Judgment and BSWTL Judgment on the Plaintiffs' claims of breach of contract and conversion in the State Court Action -- is the most glaring.

Embezzlement has been traditionally defined "as the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come." Moore v. United States, 160 U.S. 268, 269 (1895). As this Court (Feeney, J.) has stated:

> Courts have found embezzlement to exist in the context of corporate officers' and directors' unauthorized withdrawal of corporate funds as compensation. **Where the officer's compensation is established by agreement, any funds taken in excess of that constitute embezzlement for purposes of 11 U.S.C. § 523(a)(4).**

Farley v. Romano (In re Romano), 353 B.R. 738, 766 (Bankr. D. Mass. 2006)(citations omitted)(emphasis added).

The Court in In re Romano went on to find embezzlement for the purposes of Section 523(a)(4) where the corporate officer debtor in that case unilaterally increased his own compensation, wrote checks to himself and for cash, and deteriorated the financial condition of the company. Id. at 766-767.

Here, just as in In re Romano, the Court in the State Court Action specifically found that:

> With respect to the breach of contract claims, judgment shall enter in favor of Trowt. The evidence presented at trial demonstrated the following relevant facts: that Trowt and Silva had an agreement to split profits on a fifty-fifty basis; that Trowt and Silva had an agreement whereby Silva agreed to be responsible for the business's financial and administrative matters while Trowt served as the primary customer contract [sic]; that Silva breached this agreement by paying himself a larger salary and misappropriating funds belonging to [BSWTL]; and that Trowt and [BSWTL] were damaged as a result of Silva's conduct. **Similarly, as to the**

> **conversion claim, judgment shall enter in favor of Trowt, as the evidence presented at trial demonstrated that Silva misappropriated money rightfully belonging to Trowt and [BSWTL].**

Ex. A at p. 16 (emphasis added). Similarly, the Court in the State Court Action specifically found that:

> Through the evidence presented at trial, Trowt proved, by a preponderance of the evidence, that Silva breached the fiduciary duty he owed to him. In particular, Trowt proved the following relevant facts: that, as of 1997, when [BSWTL] was incorporated, he and Silva agreed to split profits on a fifty-fifty basis; that the only way [BSWTL] distributed profits was through the payment of salaries; that Silva was solely responsible for the distribution of profits; and that Silva unilaterally decreased his (Trowt's) share of the profits by decreasing his (Trowt's) salary, and increasing his own salary.

Id. at p. 13. Finally, the Court in the State Court Action found:

> First, the evidence at trial demonstrated that, between 2006 and 2011, while he was solely responsible for all financial matters related to [BSWTL's] operations, including payroll and accounts receivable, Silva siphoned revenues and skimmed profits from the business. Second, the evidence at trial demonstrated that, between this same time frame, Silva opened numerous credit accounts in [BSWTL's] name, which he used for his own personal use. For example, the evidence showed Silva used [BSWTL's] accounts to pay for dating websites, department store charges, grocery store charges, personal gas purchases, automotive repairs, and office supplies used in connection with [Silva's other business venture], his personal travel business.

Id.

Here, based on the preclusive findings in the State Court Action, Silva unquestionably unilaterally increased his own salary, misappropriated funds of both Trowt and BSWTL, and converted funds of Trowt and BSWTL. Thus, Silva's conduct, said conduct having been held by this Court to constitute embezzlement for the purposes of Section 523(a)(4), must constitute embezzlement as a matter of law and therefore the Plaintiffs are entitled to Summary Judgment on Counts III and IV of the Complaint respectively, and the Trowt and BSWTL Judgments must

be declared nondischargeable. See In re Romano, 353 B.R. at 766; see also Reed v. Zak (In re Zak), 573 B.R. 13, 35-40 (2017).

ii. Defalcation in Fiduciary Capacity

To prevail on a claim for defalcation while acting in a fiduciary capacity under Section 523(a)(4), the Plaintiffs must prove (1) that the debt in issue arose while Silva acted in a fiduciary capacity and (2) the debt arose from Silva's fraud or defalcation. Zacharakis v. Melo (In re Melo), 558 B.R. 521, 556 (Bankr. D. Mass. 2016).

"The issue of whether a party is acting in a fiduciary capacity within the meaning of § 523(a)(4) is one of federal law." Id. This Court (Feeney, J.) has observed that "fiduciary capacity for purposes of § 523(a)(4) could be established by the existence of a contract and substantial ascendancy of one shareholder over another" in the context of fifty-fifty owners of a closed corporation. In re Romano, 353 B.R. at 762-763. In Hutton v. Vasa (In re Vasa), 2016 Bankr. LEXIS 727 (D. Mass. 2016), this Court (Feeney, J.) found a fiduciary relationship for the purposes of § 523(a)(4) where the debtor and the plaintiff in that action were fifty-fifty owners of a closed corporation, and the debtor was found to have superior access to, and oversaw all of, the financial aspects and bank accounts of the corporation. In re Vasa, 2016 Bankr. LEXIS 727 at *33-35.

Here, just as in In re Vasa and just as the Court in the State Court Action found, Silva had full and exclusive access to all of BSWTL's bank accounts and financials, and, based on the agreement between Silva and Trowt, was fully responsible for all financial aspects of BSWTL's operations. Moreover, in exercising this control, Silva actually blocked Trowt from accessing BSWTL's financials and bank accounts while Silva was running the books for BSWTL.

As evidence of Silva's tight control over the financials of BSWTL, when Trowt contacted BSWTL's accountant to have he and Silva's salaries equalized, BSWTL's accountants refused based on Silva's explicit instructions. Trowt was ultimately forced to obtain an injunction in the State Court Action in order to draw an equal salary from BSWTL based on Silva's tight control over the company's financials and refusal to honor his contractual and fiduciary duties to Trowt and BSWTL.

Ultimately, this conduct, along with all of Silva's other conduct described herein and in the Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action, resulted in the Trowt and BSWTL Judgments in the State Court Action. For all of these reasons, Silva was acting in a fiduciary capacity for the purposes of § 523(a)(4).

Having established that Silva was acting in a fiduciary capacity for the purposes of Section 523(a)(4), the only question remaining is whether Silva's conduct of misappropriating monies belonging to Trowt and BSWTL, while acting in a fiduciary capacity to both, constitutes "defalcation" for the purposes of Section 523(a)(4). It does. The Supreme Court of the United States provided the general definition of defalcation in Bullock v. BankChampaign, 569 U.S. 267, 273-274 (2013)[6], and that definition remains today, as recognized by the Courts in this District.

---

[6] "Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty. That risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."

Bullock, 569 U.S. at 273-274 (internal citations and quotations omitted)

"A defalcation refers generally to a failure to account for money or property entrusted to a fiduciary." In re Sullivan, 217 B.R. at 676-677 (citations omitted). "[P]recluding the discharge of debts arising from the breach of such trust relationships [is] consistent with the policy of the Bankruptcy Code to provide a fresh start only to honest debtors." Id. at 677. Thus, "some degree of culpability is required to constitute a defalcation within the meaning of § 523(a)(4)." Id. at 678.

Here, as the Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action clearly lay out, Silva consciously and purposefully misappropriated monies of Trowt and BSWTL in breach of his fiduciary duties owed to both. To be sure, the Court explicitly described Silva as acting with "avarice" and "self-interest" in purposefully misappropriating the monies of Trowt and BSWTL. This misappropriation of monies clearly constitutes a "failure to account for money or property entrusted" to Silva in his capacity as a fiduciary to both Trowt and BSWTL, and Silva unquestionably acted with the requisite "degree of culpability" required for a finding of a defalcation for the purposes of Section 523(a)(4).

For all of these reasons, and for the reasons stated in Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action, Silva's conduct constituted embezzlement and/or defalcation while acting as a fiduciary under Section 523(a)(4) as a matter of law. Accordingly, the Plaintiffs are entitled to Summary Judgment on Counts III and IV of the Complaint, declaring the Trowt and BSWTL Judgments nondischargeable.

*C. The Plaintiffs are Entitled to Judgment as a Matter of Law on Counts I and II of the Complaint as Silva's Conduct Constituted a Debt Obtained by False Pretenses, a False Representation, or Actual Fraud.*

Section 523(a)(2)(A) of the Bankruptcy Code prohibits and individual debtor from discharging any debt obtained by "false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A).

Here, based on the findings in the State Court Action and the applicable authority, the Plaintiffs are entitled to judgment as a matter of law on Counts I and II of the Complaint as Silva's conduct and the resulting harm to the Plaintiffs constitutes a debt obtained by "false pretenses, a false representation, or actual fraud" under 11 U.S.C. § 523(a)(2)(A).

In Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997), the Court articulated the test to determine nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A):

> **First**, the debtor must have made a misrepresentation, meaning a knowingly false representation or one made in reckless disregard of the truth. **Second**, the debtor must have acted with the intent to deceive, also know as scienter. To prove scienter, the plaintiff must show the maker of the misrepresentation (a) knows or believes the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies. **Third**, the debtor must have intended to induce the creditor to rely on the false statement, **Fourth**, the creditor must have actually relied on the misrepresentation. **Fifth** the creditor's reliance must be justifiable. A person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation. **Sixth**, and finally, the plaintiff's reliance on the false statement must have caused damage.

Santos v. Souza (In re Souza), 2014 Bankr. LEXIS 5112 at *16-17 (D. Mass. 2014)(citing Palmacci, 121 F.3d at 786-787)(emphasis added).

With respect to false pretenses, this Court (Feeney, J.) has recognized:

> The concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses may be implied form conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts intended to deceive. It is a series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongly induced by a debtor to transfer property or extend credit to the debtor. Silence or

> concealment as to a material fact can constitute false pretenses. In short, false pretenses can be made in any of the ways in which ideas can be communicated.

Youssef v. Fogarty (In re Fogarty), 2010 Bankr. LEXIS, 716 at *19-21 (D. Mass. 2010)(citing Ostertag v. Overall (In re Overall), 248 B.R. 146, 150 (Bankr. W.D. Mo. 2000)).

Moreover, with respect to fraudulent intent, this Court (Feeney, J.) has recognized:

> The fraudulent intent element of § 523(a)(2)(A) . . . may be inferred form the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor. The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.

Id. at *23-24 (citing Wolfe v. McGuire (In re McGuire), 284 B.R. 481 (Bankr. D. Colo. 2002)(internal citations and quotations omitted)).

Finally, with respect to fraud, generally, this Court (Feeney, J.) has recognized:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

Id. at *17 (citing Blacksmith Investments, LLC v. Woodford (In re Woodford), 403 B.R. 177, 186 (Bankr. D. Mass. 2009)); see also Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001)("actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. . . . **When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.**")(emphasis added).

Here, pursuant to an explicit agreement between Trowt and Silva, Silva was solely responsible for the paying of BSWTL's salaries and those salaries were to be split fifty-fifty between Trowt and Silva. Silva breached that agreement by unilaterally, fraudulently, and secretly adjusting the salary ratio to his benefit, which served to "cheat [Trowt and BSWTL] of property or a legal right." In re Vitanovich.

To be sure, Silva's conduct, as outlined by the Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action, clearly shows that the Trowt and BSWTL Judgments constitute debts obtained by "false pretenses, a false representation, or actual fraud" barring their discharge under 11 U.S.C. § 523(a)(2)(A). To whit:

> Through the evidence presented at trial, Trowt proved, by a preponderance of the evidence, that Silva breached the fiduciary duty he owed to him. In particular, Trowt proved the following relevant facts: that, as of 1997, when [BSWTL] was incorporated, he and Silva agreed to split profits on a fifty-fifty basis; that the only way [BSWTL] distributed profits was through the payment of salaries; that Silva was solely responsible for the distribution of profits; and that Silva unilaterally decreased his (Trowt's) share of the profits by decreasing his (Trowt's) salary, and increasing his own salary. **In paying himself a higher salary, i.e., splitting profits at a seventy-five to twenty-five percent ration in his favor, Silva clearly acted out of "avarice" and "self-interest" in derogation of the fiduciary duty he owed to Trowt. Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty).**
>
> ***
>
> In addition, Trowt proved, by a preponderance of the evidence, that Silva breached the fiduciary duty he owed to [BSWTL]. In fact, the evidence presented reveals two different, but related, bases for this claim. First, the evidence at trial demonstrated that, between 2006 and 2011, while he was solely responsible for all financial matters related to [BSWTL's] operations, including payroll and accounts receivable, Silva siphoned revenues and skimmed profits from the business. Second, the evidence at trial demonstrated that, between this same time frame, Silva opened numerous credit accounts in [BSWTL's] name, which he used for his own personal use. For example, the evidence showed Silva used [BSWTL's] accounts to pay for dating websites, department store charges, grocery store charges, personal gas purchases, automotive repairs, and office supplies used in connection with [Silva's other business venture], his personal travel business. **In engaging in**

> **this wrongdoing, Silva acted out of "avarice" and "self-interest," contrary to the fiduciary duty he owed [BSWTL]. Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty), as derivative of [BSWTL].**
>
> ***
>
> Trowt's claim for breach of contract (Count III) and his derivative claim for conversion (Count IV) . . . are subsumed into the above analysis. These claims assert the same theories of liability and request, essentially, the same relief. For this reason, the court need not analyze them in detail. Nevertheless, the court notes the following: With respect to the breach of contract claims, judgment shall enter in favor of Trowt. The evidence presented at trial demonstrated the following relevant facts: that Trowt and Silva had an agreement to split profits on a fifty-fifty basis; that Trowt and Silva had an agreement whereby Silva agreed to be responsible for the business's financial and administrative matters while Trowt served as the primary customer contract [sic]; that Silva breached this agreement by paying himself a larger salary and misappropriating funds belonging to [BSWTL]; and that Trowt and [BSWTL] were damaged as a result of Silva's conduct. **Similarly, as to the conversion claim, judgment shall enter in favor of Trowt, as the evidence presented at trial demonstrated that Silva misappropriated money rightfully belonging to Trowt and [BSWTL].**

Ex. A at pp. 13-16 (emphasis added).

For all of these reasons, and for the reasons stated in the Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action, Silva's conduct renders the resulting debt a debt "obtained by false pretenses, a false representation, or actual fraud" under Section 523(a)(2)(A) as a matter of law. Accordingly, the Plaintiffs are entitled to Summary Judgment on Counts I and II of the Complaint, rending the Trowt and BSWTL Judgments nondischargeable.

## CONCLUSION

Silva's conduct, as exhaustively outlined in the Court's Findings of Fact, Rulings of Law, and Order for Judgment in the State Court Action, clearly establishes nondischargeability of the Trowt and BSWTL Judgments pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4) as a matter

of law. Accordingly, the Plaintiffs' Motion for Summary Judgment must be **ALLOWED**, and the Trowt and BSWTL Judgments must be declared nondischargeable in Silva's underlying Chapter 7 Bankruptcy Case.

[Signature Page and Certificate of Service Follow]

Respectfully submitted,

PETER B. TROWT and BEVERLY STORAGE WAREHOUSE & TRAILER LEASING, INC.,
By their attorney,

/s/Christopher W. Parker
Christopher W. Parker (BBO# 389720)
Law Offices of Christopher W. Parker
900 Cummings Center, Suite 207T
Beverly, MA 01915
Phone: 978-232-4201
Fax: 978-922-6464
Email: cparker@metaxasbrown.com

Dated: December 20, 2018

# EXHIBIT A

27

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss.**

**SUPERIOR COURT
CIVIL ACTION
NO. 2011-01279**

**PETER TROWT,**
**Plaintiff/Defendant-in-Counterclaim,**

**v.**

**RICHARD SILVA,**
**Defendant/Plaintiff-in-Counterclaim,**

**AND**

**BEVERLY STORAGE WAREHOUSE & TRAILER LEASING, INC.,**
**Derivatively,**

**v.**

**TROWT MOVING & STORAGE, INC.,**
**Third-Party Defendant.**

**FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER FOR JUDGMENT**

## INTRODUCTION

The plaintiff, Peter Trowt ("Trowt"), and the defendant, Richard Silva ("Silva"), each own a fifty percent interest in Beverly Storage Warehouse & Trailer Leasing, Inc. ("Beverly Storage"). This case involves the breakdown of their business relationship and the alleged misappropriation of certain Beverly Storage assets. On November 8, 2011, Trowt filed the First Amended Complaint and, on December 5, 2011, Silva filed the Amended Counterclaim and Third Party Claim. In order to resolve this matter, the court held a five-day jury waived trial between February 3, 2014 and February 10, 2014.

Trowt asserts claims against Silva, individually, for breach of fiduciary duty (Count II) and breach of contract (Count III), as well as derivatively, on behalf of Beverly Storage, for breach of fiduciary duty (Count I) and conversion (Count IV). He also asserts a claim for an accounting. Essentially, Trowt argues Silva violated his duty of utmost good faith and loyalty by misappropriating certain Beverly Storage assets to his (Trowt's) detriment. Trowt accuses Silva of three basic categories of misconduct. First, Trowt alleges that, contrary to their agreement to split profits fifty-fifty, Silva, who was responsible for all of Beverly Storage's financial matters, unevenly distributed company profits by paying himself a higher salary. Second, Trowt claims that Silva siphoned cash from customer payments meant to be deposited in Beverly Storage's accounts. Third, Trowt contends Silva misappropriated assets by using company credit cards to pay for personal items/expenses. At trial, in support of these claims, Trowt offered the expert testimony of Kathy L. Parker ("Parker"), a certified public accountant with a Master of Science in Taxation.

Silva asserts claims against Trowt, individually, for breach of fiduciary duty (Counterclaim I) and breach of contract (Counterclaim III), as well as derivatively, on behalf of Beverly Storage, for breach of fiduciary duty (Counterclaim II). In addition, Silva asserts a third-party claim against Trowt Moving & Storage, Inc. ("Trowt Moving"), which is Trowt's separately owned moving business, for breach of contract. Basically, Silva claims Trowt breached his duties of good faith and loyalty and caused Beverly Storage and thus, him, economic harm by permitting Trowt Moving to use Beverly Storage's land and facilities without paying rent. At trial, Silva offered no expert testimony or other evidence sufficient to support of these claims. In particular, aside from his own speculations, he offered no evidence describing his measure of damages.

## FINDINGS OF FACT

Based upon the evidence presented at trial, including the credible testimony of each party's witnesses and the various exhibits that were submitted, the court makes the following findings of fact.

**The Parties and Relevant Business Entities:**

Trowt is an individual residing in Beverly, Massachusetts. At all times relevant to the current matter, Trowt has owned a fifty percent interest in Beverly Storage. Silva is an individual residing in Salem, Massachusetts. At all times pertaining to the current dispute, Silva has also owned a fifty percent interest in Beverly Storage. Beverly Storage is a small closely held corporation with a principal place of business at 145 Rear Hale Street, Beverly, Massachusetts.[1] Beverly Storage receives revenue from its customers in two ways: (1) from the rental of storage rooms at its warehouse in Beverly; and (2) from the rental of one of approximately forty-two various sized trailers, which it pays $2,000.00 per month to store at a rental location in Manchester-by-the-Sea, Massachusetts. Beverly Storage is named in this suit in order for the parties to obtain requested derivative relief.

Trowt Moving is a business entity formed under the laws of Massachusetts. It has a principal place of business also located at 145 Rear Hale Street. Trowt is the sole shareholder and President of Trowt Moving. Trowt Moving is a moving company that moves personal items belonging to its customers from one place to another. In the late 1980s, Silva worked for Trowt Moving. Then, in 1993, Trowt and Silva formed a partnership when each purchased a fifty percent interest in Beverly Storage. In 1993, Trowt and Silva also each purchased a fifty percent

---

[1] Beverly Storage only has two full time employees, Trowt and Silva, and one part time employee, a young woman who works part-time on Saturdays.

ownership interest in the land located at 145 Rear Hale Street, which is currently owned by a realty trust identified as the 145 Rear Hale Street Realty Trust (the "Realty Trust").[2]

In 1997, Trowt and Silva formally incorporated Beverly Storage and each became a fifty percent shareholder. In this case, Silva claims Trowt Moving unfairly and without compensation made use of Beverly Storage's land and facilities. The court finds that the evidence presented at trial demonstrated that there is a symbiotic relationship between Trowt Moving and Beverly Storage. Even before Trowt and Silva became partners and shareholders in Beverly Storage, Trowt Moving and Trowt accounted for the origination of approximately ninety-five percent of Beverly Storage's customers. To this day, Trowt and Trowt Moving are still responsible for the origination of a significant portion of Beverly Storage's business.

Trowt Moving also provided Beverly Storage with other benefits. For example, Trowt Moving regularly moves and transports trailers belonging to Beverly Storage, which contain goods and property belonging to Beverly Storage's customers, as Beverly Storage does not own its own tractor. In addition, Trowt Moving's employees regularly spend time performing tasks for Beverly Storage, getting customers to sign contracts, answering the office telephone, sending out bills, addressing customer concerns, and collecting certain fees. Beverly Storage does not pay Trowt Moving any money or reimburse it in any way for these tasks. Thus, the court finds that, to the extent that Trowt Moving may have benefited from its relationship with Beverly Storage, Beverly Storage benefited equally from the relationship.

---

[2] Currently, Trowt and Silva are the sole trustees and beneficiaries of the Realty Trust.

## TROWT'S CLAIMS

**Beverly Storage Management & Operations:**

Beverly Storage has only distributed profits in the form of weekly salaries. In 1993, when Trowt and Silva purchased Beverly Storage's assets, they agreed to split all the business profits and losses equally, on a fifty-fifty basis. Later, at some point in 1994, Trowt agreed to allow Silva to collect a higher salary than he (Trowt) was receiving, at a ratio of sixty-five (Silva) to thirty five (Trowt) percent. Nevertheless, thereafter, when Trowt and Silva officially incorporated the business in 1997, they reverted back to their original agreement that all profits and losses would be split on a fifty-fifty basis.

From the commencement of Trowt and Silva's partnership in 1993 until some point after the start of this litigation, Silva was responsible for all financial aspects of the company, including, accounts receivable, accounts payable, and vendor payments, as well as other office administration tasks. Silva was the only person at Beverly Storage with access to company passwords, bank accounts, credit cards, and payroll services. Silva was the only person who dealt with Beverly Storage's accountant and was responsible for all the company's accounting functions. Trowt, on the other hand, was responsible for generating business for Beverly Storage, which included providing estimates and maintaining good client relations.

Sometime in or about 2006 or 2007, after Silva started his own travel business, Clear Skys Travel ("Clear Skys"), the division of responsibilities began to shift. Trowt and Trowt Moving employees began assuming some of the office administration tasks Silva had typically completed, as he was no longer at the office on a full-time basis. By the time litigation began in 2011, Silva was, generally, not at Beverly Storage during the company's regular business hours, which required that Trowt or Trowt Moving's employees handle all day-to-day office

administration tasks. Later, in or about late 2012, Trowt officially took over handling a majority of the accounts receivable functions and processed a majority of all customer payments.

**Unequal Salaries:**

In 1993, when Trowt and Silva purchased Beverly Storage, they agreed to split profits evenly, each receiving an equal salary. At some point in 1994, Silva began receiving a higher salary than Trowt, at a sixty-five to thirty-five percent ratio. Thereafter, following the 1997 incorporation of Beverly Storage, Trowt and Silva agreed to go back to splitting profits on a fifty-fifty basis. By mid to late 1999, Trowt and Silva were receiving equal pay. Sometime in mid to late 2000, Trowt's salary was lowered and profits were being split at a sixty-five to thirty-five percent ratio in Silva's favor. Silva made this change without Trowt's knowledge or consent.

From 2006 until November 2011, Silva received a higher salary than Trowt. In fact, between 2006 and late 2011, salaries were split between Trowt and Silva at a seventy-five to twenty-five percent ratio favoring Silva. Trowt never agreed to this salary adjustment and did not discover the seventy-five twenty-five percent split until the latter part of 2010. At that time, Trowt instructed Silva to equalize their salaries, but he (Silva) refused. In fact, Silva, who had sole control of Beverly Storage's payroll, instructed Craig & Withers, Beverly Storage's accountant, to ignore Trowt's demands for equal pay. When Trowt contacted Craig & Withers, he was informed that per Silva's instructions, they could not make any adjustments to his salary. Trowt and Silva's salaries were not equalized until November 2011, when Trowt obtained a preliminary injunction in connection with this case ordering Silva to make their salaries equal.

From 2006 to November 2011, Silva received $359,575.00 in salary from Beverly Storage while Trowt received only $141,250.00 in salary from Beverly Storage. *Exhibit 17,*

*Parker, Expert Witness Report, October 14, 2013* (hereinafter, "*The Parker Report*"). Thus, from 2006 to November 2011, when Trowt and Silva agreed to split profits on a fifty-fifty basis, when salaries were the only form of profit distribution Beverly Storage made, and when Silva was solely responsible for the company's payroll, Silva paid himself $218,325.00 more than he paid Trowt. *Id.*

**Siphoning Revenue:**

In addition to paying himself a higher salary, Silva siphoned revenue and cash from Beverly Storage. Between 2006 and 2011, according to business records, Beverly Storage's revenue remained relatively flat, averaging approximately $200,000.00 per year. *The Parker Report*. Then, in late 2012, when Trowt took over the accounts receivable, including the responsibility for depositing all customer payments into Beverly Storage's bank account, revenue spiked. *Id.* In fact, annualizing the total deposits through August 2013, shows a nineteen percent increase in revenue for 2013. *Id.* During this spike in revenue, Beverly Storage made no operational changes other than the fact that Trowt began handling Beverly Storage's deposits. Being conservative, estimating Silva was skimming only ten percent from Beverly Storage's revenues, there would be an additional $140,815.20 in deposits for the period between January 2006 and December 2011. *Id.*

Silva also used funds from Beverly Storage to put a deposit on land he wished to purchase in Rowley, Massachusetts. Silva's testimony on this issue was contradictory and not credible. First, Silva testified that there was only one piece of land that he wanted to purchase and that the only $5,000.00 check was shredded by the seller's real estate agent. Then, he testified that the $5,000.00 deposit check was returned. When Trowt's attorney showed Silva

another $5,000.00 check, written off of Beverly Storage's account, Silva admitted that he had placed a second $5,000.00 deposit on a second piece of land, which was forfeited.

Silva also collected cash from Beverly Storage's customers to bring with him on vacation. At trial, Silva's ex-wife, Mary Rees, testified that, prior to scheduled vacation trips, which occurred at least four times per year, Silva would hoard cash (at least $500.00) from Beverly Storage's deposits for his personal use.

**Misappropriation of Beverly Storage's Assets for Personal Use:**

Between 2006 and 2011, Silva opened at least five credit cards in Beverly Storage's name. Silva opened all of these credit accounts without informing Trowt of their existence. Silva used Beverly Storage's credit cards for numerous personal purchases including: dating websites, i.e., match.com and singlesnet.com, restaurants, motorcycle stores, Stop & Shop, numerous gas purchases, massage parlors, shoe polish, noise canceling headphones, numerous telephones, and other various purchases unrelated to the warehouse and storage business. Silva made personal use of every credit account he opened in Beverly Storage's name. When questioned about these allegations at trial, Silva had no credible explanation for the various personal charges; he could not recall what was purchased or, for example, credibly explain why Beverly Storage's various credit accounts listed charges for restaurants, massage parlors, grocery stores, etc.[3]

Silva used at least $104,355.00 worth of Beverly Storage's money for his own personal use. *The Parker Report*. These personal charges were split into four categories of misappropriation: (1) personal expenses, such as dating websites and department stores; (2) automotive expenses, such gas purchases and automotive repairs; (3) unrelated office supply

[3] At trial, Silva's ex-wife, Rees, testified that, during her marriage to Silva, he would regularly (at least monthly) use Beverly Storage credits cards at restaurants when paying for dinner and state words to the effect that "this one is on the warehouse."

purchases; and (4) normal but excessive expenses. *Id.* Parker testified that, in reaching this total, she used conservative estimates and that, if she were able to obtain more credit card records the amount and number of Silva's personal charges would be even greater. The court credits this testimony. Trowt never agreed that Silva could use Beverly Storage's credit accounts for his own personal expenses or for expenses related to Clear Skys. Once this lawsuit began and Beverly Storage's credit accounts were cancelled, all inappropriate and excessive charges stopped.

## SILVA'S COUNTERCLAIMS

**Permission to Park at 145 Rear Hale Street:**

Silva seeks $500.00 per week from Trowt Moving as payment for it parking eight pieces of equipment at 145 Rear Hale Street. Trowt Moving has parked its vehicles at 145 Rear Hale Street since 1993. There was never any formal agreement between Trowt Moving/Trowt and Beverly Storage/Silva that Trowt Moving would pay $500.00 per week to park its vehicles at 145 Rear Hale Street. During trial, Silva provided no evidence, aside from his own speculation, as to the reasonable value of the parking spaces Trowt Moving uses. Moreover, the only parking bill Silva presented is dated October 2013, which is two years after litigation commenced.

**Overnight Storage:**

Silva seeks overnight storage fees from Trowt Moving for it charging to keep customers' goods on its trucks parked at 145 Rear Hale Street for one or two nights when customers need to be out of their old home before they can move into their new home. Silva has known that Trowt Moving charges overnight storage fees since at least 2003. And, there was never any formal agreement between Trowt Moving/Trowt and Beverly Storage/Silva whereby Trowt Moving agreed to pay Beverly Storage overnight storage fees in these circumstances. At trial, aside from

his own speculation, Silva provided no evidence relating to the amount of damage Beverly Storage sustained as a result of Trowt Moving's collection of overnight storage fees.[4]

**Office Space:**

Silva seeks monthly rental fees from Trowt Moving for its use of office space located at 145 Rear Hale Street. The office, which Trowt Moving uses, was constructed, built, and paid for solely by Trowt Moving. And, there was never any formal agreement between Trowt Moving/Trowt and Beverly Storage/Silva that Trowt would pay for the use of this office space. During trial, Silva provided no evidence, aside from his own speculation, as to what would constitute a reasonable rental fee for the office space Trowt Moving uses. Moreover, the only office rental bill Silva presented is dated November 2011, right around the time Trowt commenced this suit. See *Exhibit 22*.

**Miscellaneous Claims:**

Silva claims that a Trowt Moving employee damaged a trailer belonging to Beverly Storage and that, Trowt Moving refused to pay for the damage. Silva has, however, known about this alleged damage since 2005 and, at trial, he presented no evidence showing the damage included or the cost of repairs.

Silva seeks to charge Trowt Moving for storing trailers at the location Beverly Storage rents in Manchester-by-the-Sea. There was never any formal agreement between Trowt Moving/Trowt and Beverly Storage/Silva that Trowt Moving would pay to store its trailers at the Manchester-by-the-Sea location. This practice has been going on since before 2005 and Trowt Moving has never been billed for storing its trailers at the Manchester-by-the-Sea location.

[4] Even if Trowt Moving collects overnight storage fees from its customers for property it allows them to store on its trucks for a day or two, there is no lost opportunity to Beverly Storage, as Beverly Storage does not have the manpower to unload/reload Trowt Moving's customers' goods into a Beverly Storage trailer, all to obtain a fee for one or two nights of storage.

Notably, at least one of Trowt Moving's trailers located in Manchester-by-the-Sea is full of goods belonging to a Beverly Storage customer and Beverly Storage receives all storage fees associated with the use of this trailer. Further, Beverly Storage does not own its own tractor, consequently, the only way the trailers belonging to Beverly Storage can be transported to and from Manchester-by-the-Sea is if Trowt Moving uses its tractor to move them.

Silva claims Trowt Moving stores various miscellaneous items belonging to it at 145 Rear Hale Street without Beverly Storage's permission. Based on the evidence presented at trial, the court concludes any miscellaneous property Trowt Moving stores at 145 Rear Hale Street is used for both Trowt Moving and Beverly Storage's customers, including the boxes, crates, pallet jack, padding and plastic wrap. The court further concludes that these items are commingled with similar items belonging to Beverly Storage and, thus, the items are not taking up space that Beverly Storage would otherwise be able to rent.

## RULINGS OF LAW

In this case, Trowt asserts individual claims against Silva for breach of fiduciary duty (Count II) and breach of contract (Count III) as well as derivative claims, on behalf of Beverly Storage, for breach of fiduciary duty (Count I) and conversion (Count IV). Meanwhile, Silva asserts individual claims against Trowt for breach of fiduciary duty (Counterclaim I) and breach of contract (Counterclaim III) as well as a derivative claim, on behalf of Beverly Storage, for breach of fiduciary duty (Counterclaim II). In addition, Silva asserts a third-party claim against Trowt Moving for breach of contract. Below, the court addresses each of these claims.

### I. Breach of Fiduciary Duty (Counts I & II and Counterclaims I & II)

In a close corporation, shareholders owe to the other shareholders and the corporation a duty of utmost good faith and loyalty. *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*,

367 Mass. 578, 593 (1975), quoting *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952) (internal quotations omitted). Essentially, shareholders of a closely held corporation owe to the business and their fellow shareholders "substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *Id.* This requires that the shareholders place the welfare of the business and that of the other shareholders ahead of their own personal interests. *Demoulas* v. *Demoulas Supermarkets, Inc.*, 421 Mass. 501, 529 (1997). Shareholders in a close corporation are thus not permitted to frustrate the reasonable expectations of the other shareholders with respect to share ownership, such as with regard to the fair distribution of income and assets, shared decision-making, control of the business, and the receipt of fair value for their contributions to the enterprise. See, e.g., *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 843, 850 (1976). The law prohibits shareholders in a close corporation from acting out of "avarice, expediency or self-interest" in derogation of their duty of loyalty to the corporation and its other stockholders. *Donahue*, 367 Mass. at 593.

In the current matter, Trowt and Silva accuse each other of breaching the fiduciary duty that shareholders in a close corporation owe to each other and the corporation. The elements of such a claim are: (1) the existence of a fiduciary duty, based upon the relationship of the parties; (2) a breach of that duty; (3) damages; and (4) a causal connection between the breach of duty and the damage suffered. *Hanover Ins. Co.* v. *Sutton*, 43 Mass. App. Ct. 153, 164 (1989). The determination of whether a breach of fiduciary duty has occurred is a question of law for the court, as is the remedy for such a breach. See *Merola* v. *Exergen Corp.*, 423 Mass. 461, 461 (1996). It is undisputed that Beverly Storage is a closely held corporation and that, as such, Trowt and Silva owe each other and it a duty of utmost good faith and loyalty. The only

questions left for the court to decide are who breached his fiduciary duty and who is entitled to recover damages.

**Trowt's Claims:**

Through the evidence presented at trial, Trowt proved, by a preponderance of the evidence, that Silva breached the fiduciary duty he owed him. In particular, Trowt proved the following relevant facts: that, as of 1997, when Beverly Storage was incorporated, he and Silva agreed to split profits on a fifty-fifty basis; that the only way Beverly Storage distributed profits was through the payment of salaries; that Silva was solely responsible for the distribution of profits; and that Silva unilaterally decreased his (Trowt's) share of the profits by decreasing his (Trowt's) salary, and increasing his own salary. In paying himself a higher salary, i.e., splitting profits at a seventy-five to twenty-five percent ratio in his favor, Silva clearly acted out of "avarice" and "self-interest" in derogation of the fiduciary duty he owed Trowt. Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty).

As no contrary evidence was presented at trial on the issue of damages, as a starting point, the court accepts the figures set forth in *The Parker Report*. From 2006 to November 2011, contrary to their agreement to split profits, i.e., to split salaries, on a fifty-fifty basis, Silva paid himself $359,575.00 in salary while he paid Trowt only $141,250.00. A fifty-fifty split would have resulted in Trowt and Silva each receiving $250,412.50. Thus, on Claim II (breach of fiduciary duty), judgment shall enter in favor of Trowt in the amount of $109,162.50.

In addition, Trowt proved, by a preponderance of the evidence, that Silva breached the fiduciary duty he owed Beverly Storage. In fact, the evidence presented reveals two different, but related, bases for this claim. First, the evidence at trial demonstrated that, between 2006 and 2011, while he was solely responsible for all financial matters related to Beverly Storage's

operations, including payroll and accounts receivable, Silva siphoned revenues and skimmed profits from the business. Second, the evidence at trial demonstrated that, between this same time frame, Silva opened numerous credit accounts in Beverly Storage's name, which he used for his own personal use. For example, the evidence showed Silva used Beverly Storage's accounts to pay for dating websites, department store charges, grocery store charges, personal gas purchases, automotive repairs, and office supplies used in connection with Clear Skys, his personal travel business. In engaging in this wrongdoing, Silva acted out of "avarice" and "self-interest," contrary to the fiduciary duty he owed Beverly Storage. Consequently, Trowt is entitled to judgment in his favor on Count II (breach of fiduciary duty), as derivative of Beverly Storage.

Again, as no contrary evidence was presented at trial on the issue of damages, as a starting point, the court references *The Parker Report*. If Silva had properly deposited all funds he received into Beverly Storage's account for the period 2006 to November 2011, there would have been an additional $140,815.20 in deposits.[5] And, if Silva had not used Beverly Storage's money for his own personal use, the company would also have had another $104,355.00 in revenue. Thus, on Claim I (breach of fiduciary duty) judgment shall enter in favor of Trowt, derivative of Beverly Storage, in the amount of $245,170.20.

**Silva's Counterclaims:**

On Counterclaims I and II, judgment shall enter in favor of Trowt. Silva failed to provide sufficient evidence to demonstrate Trowt breached the fiduciary duty he owed him or Beverly Storage. These claims are premised upon several different theories. First, Silva claims Trowt

---

[5] *The Parker Report* states that, but for Silva's siphoning of revenue, there would have been an additional $211,223.00 in deposits between 2006 and 2011. This figure is based upon Parker's estimate that Silva was skimming approximately fifteen percent from Beverly Storage's annual profits. To be conservative, and to take into account the fact that profits for 2013 did not actually show a nineteen present increase, as Parker predicted they would, the court reduces the fifteen percent to ten percent.

breached his fiduciary duty by parking/storing Trowt Moving equipment at 145 Rear Hale Street without paying rent. Second, he claims Trowt breached his fiduciary duty by leaving storage trailers at the Manchester-by-the-Sea location without paying rent. Third, he claims Trowt breached his duty by failing to pay rent for office space he uses at 145 Rear Hale Street.

These assertions fail with little analysis. At trial, Silva failed to establish that there was ever any agreement between Trowt/Trowt Moving and Beverly Storage/Silva whereby Trowt Moving would pay to park its equipment at 145 Rear Hale Street, pay to store trailers at the Manchester-by-the-Sea location, or pay to rent office space at 145 Rear Hale Street. Rather, the evidence established that Trowt Moving and Beverly Storage have a symbiotic relationship. And that, to the extent Trowt Moving benefited from its relationship with Beverly Storage, Beverly Storage equally benefited from that relationship. An example of this symbiotic relationship is demonstrated by the fact that Beverly Storage does not even own a tractor to move its trailers and thus, the only way the storage trailers can be moved from the warehouse in Beverly to the location in Manchester-by-the-Sea is by using Trowt Moving's tractor.

Last, Silva argues that, in charging Trowt Moving customers overnight storage fees, Trowt usurped a corporate opportunity from Beverly Storage. This claim appears to be premised on the idea that, if Trowt did not allow its customers to store their items in its trucks overnight, the customers would pay to store their items at Beverly Storage. This claim is without merit. While it is true that a shareholder breaches "his fiduciary duty by acquiring or diverting a corporate business opportunity for his personal profit[,]" the fact that the corporation would not have been able to avail itself of that opportunity is a defense to such a claim. *Puritan Med. Ctr., Inc.* v. *Cashman*, 413 Mass. 167, 177-178 (1992). The evidence presented at trial establishes that this was the case in the current matter. Even assuming Trowt Moving's customers would

choose to rent space at Beverly Storage, Beverly Storage did not have the manpower and resources to unload and reload Trowt Moving's trucks all to obtain a one or two-day storage fee.[6]

### II. Breach of Contract and Conversion

Trowt's claim for breach of contract (Count III) and his derivative claim for conversion (Count IV) as well as Silva's counterclaim for breach of contract (Counterclaim III) are subsumed into the above analysis. These claims assert the same theories of liability and request, essentially, the same relief. For this reason, the court need not analyze them in detail. Nevertheless, the court notes the following: With respect to the breach of contract claims, judgment shall enter in favor of Trowt. The evidence presented at trial demonstrated the following relevant facts: that Trowt and Silva had an agreement to split profits on a fifty-fifty basis; that Trowt and Silva had an agreement whereby Silva agreed to be responsible for the business's financial and administrative matters while Trowt served as the primary customer contract; that Silva breached this agreement by paying himself a larger salary and misappropriating funds belonging to Beverly Storage; and that Trowt and Beverly Storage were damaged as a result of Silva's conduct. Similarly, as to the conversion claim, judgment shall enter in favor of Trowt, as the evidence presented at trial demonstrated that Silva misappropriated money rightfully belonging to Trowt and Beverly Storage.

### III. Silva's Third-Party Claim Against Trowt Moving for Breach of Contract

Silva asserts a third-party claim against Trowt Moving for breach of contract in connection with Trowt Moving's failure to pay for parking its vehicles at 145 Rear Hale Street, failing to pay to store its trailers at the Manchester-by-the-Sea location, and for failing to pay rent for the use of office space at 145 Rear Hale Street. This claim fails. To establish a claim for

---

[6] Even if Silva had presented sufficient evidence to factually support his claims for breach of fiduciary duty, Counterclaim II, asserted derivatively on behalf of Beverly Storage, would still fail, as he did not send a demand letter as Mass. R. Civ. P. 23.1 requires.

breach of contract, a plaintiff must demonstrate the following: (1) an agreement exists between the plaintiff and the defendant; (2) the plaintiff fully performed his obligations under the agreement; (3) the defendant breached the agreement; and (4) the plaintiff suffered damages as a result of the breach. See *Singarella* v. *Boston*, 342 Mass. 385, 387 (1961); see also Richard W. Bishop, Prima Facie Case § 2.1, at 13 (2005). At trial, Silva failed to provide sufficient evidence to demonstrate there was ever any agreement between Trowt/Trowt Moving and Beverly Storage/Silva regarding parking, rental payments, or storage fees.[7] Instead, the evidence demonstrated that Trowt Moving and Beverly Storage worked in a symbiotic relationship where each used the services and facilities of the other on an as needed basis with no formal reimbursement. Judgment shall enter in favor of Trowt Moving on the third party claim for breach of contract.

**IV. Accounting**

Trowt has sought an accounting in this matter. An accounting is proper where a violation of a fiduciary relationship has been established, but reconciling the rights and obligations of the parties is so complicated that it cannot be conveniently accomplished by the court. See *In re Evangelist*, 760 F.2d 27, 29-30 (1st Cir. 1985); *Crane* v. *Royster*, 255 Mass. 118, 120 (1926). This is not the case here. Instead, in this case, an accounting appears unnecessary. The evidence demonstrates that Trowt is entitled to damages in the amount of $109,162.50 for his direct claim of breach of fiduciary duty and in the amount of $245,170.20 for the claim of breach of fiduciary duty, which he asserts derivatively on behalf of Beverly Storage.

---

[7] The only evidence Silva presented in support of the existence of some agreement between Trowt/Trowt Moving and Beverly Storage/Silva regarding the payment of rent are monthly statements, which include an attached transaction history. The court does not find these monthly statements to be credible. The statements identify a due date of December 8, 2006, but are themselves dated in 2011 around the time litigation in this matter began. Such discrepancies with the dates inevitably leads to the inference that these monthly statements are not accurate invoices from the time period in question but, rather, were created solely in connection with the present litigation.

**ORDER**

Based upon the findings of fact and rulings of law made after trial on the merits, the court shall enter judgment in favor of Trowt as to all claims he asserts individually against Silva as well as to those he asserts derivatively on behalf of Beverly Storage. Judgment shall also enter in favor of Trowt as to all counterclaims Silva asserts individually against him as well as to those Silva asserts derivatively on behalf of Beverly Storage. Finally, judgment shall enter in favor of Trowt Moving as to Silva's third-party claim for breach of contract. Specifically with respect to Trowt's claim for breach of fiduciary duty, judgment shall enter against Silva in the amount of $109,162.50. And, as to the claim for breach of fiduciary duty Trowt asserts as derivative of Beverly Storage, judgment shall enter against Silva in the amount of $245,170.20. Judgment is **ORDERED** entered accordingly upon the docket by the clerk magistrate and notice shall be provided to the parties pursuant to Mass. R. Civ. P. 58.

SO ORDERED :

Hon. Robert A. Cornetta
Justice

Date: October 31, 2014